**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

Catalina Lighting, Inc., *et al.*,[1]

Debtors.

_____/

Chapter 11

Case No. 10-14786-RAM

(Joint Administration Pending)

**DECLARATION OF A. CORYDON MEYER, CHIEF EXECUTIVE OFFICER,**
**IN SUPPORT OF CHAPTER 11 PETITIONS AND FIRST DAY MOTIONS**

I, A. Corydon Meyer, declare that:

1.      I am the Chief Executive Officer and President of debtors, Catalina Lighting, Inc. ("Catalina") and Catalina Industries, Inc. ("Catalina Industries") (collectively, "Debtors").

2.      As the Chief Executive Officer and President of the Debtors, I am responsible for overseeing the day-to-day operations and business affairs of the Debtors.  I am also familiar with the Debtors' books and records.

3.      On February 25, 2010, the Debtors each filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").  The Debtors each continue in the management of the business as debtors-in-possession pursuant to Sections 1107 and 1108 of the Bankruptcy Code.  In order to enable the Debtors to operate effectively and avoid the adverse effects of the Chapter 11 filings, the Debtors have requested various types of relief in "first-day" applications and motions filed with the Court.

---

[1]   The Debtors are the following two (2) entities (the last four digits of their respective taxpayer identification numbers follow in parentheses):  Catalina Lighting, Inc., a Florida corporation (8266); and Catalina Industries, Inc., a Florida corporation (4785).  The address of each of the Debtors is 18191 NW 68th Avenue, Hialeah, FL 33015.

4.      I submit this affidavit in support of the Debtors' Chapter 11 petitions and first-day applications in the above-captioned Chapter 11 cases.  Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant first-day application or motion.  Except as otherwise indicated, all facts set forth in this affidavit are based upon my personal knowledge, my review of relevant documents, or my opinion based upon my experience and knowledge of the Debtors' operations and financial condition.  If I were called upon to testify, I could and would testify competently to the facts set forth herein.  I am authorized to submit this affidavit.

5.      Part I of this affidavit describes the Debtors' business and capital structure, as well as the events leading up to the filing of the Chapter 11 petitions.  Part II sets forth the relevant facts in support of the Debtors' various first-day applications and motions filed concurrently herewith.

## I.      BACKGROUND

### A.      Background, Current Business Operations and Events Leading to Bankruptcy

6.      Catalina is a Florida corporation engaged in the design, marketing and distribution of a broad line of high quality and innovative consumer lighting products in the United States and Canada.  With some of the most recognizable names in the industry, such as Catalina™, Dana™, Illuminada™, VisionMax™ and Tensor®, Catalina's customers include do-it-yourself home centers, national retail chains, office superstore chains, mass merchandisers, warehouse clubs, discount department stores and hardware stores.  Catalina has established relationships with top retailers such as Lowes, WalMart, Sears, OfficeMax, Staples, Bed Bath & Beyond, Kmart, Ace Hardware, Canadian Tire and Rona.

7.      Catalina's headquarters are located in Miami, Florida.  In order to support its sales and distribution efforts in the U.S. and Canada, Catalina leases warehouses in Tupelo,

2

Mississippi and Mississauga, Canada. Catalina also maintains a sales office in Mooresvillle, North Carolina and a showroom in Highpoint, North Carolina.

8.      Catalina's North American Operations are conducted through its wholly-owned subsidiaries, Catalina Industries, a Florida corporation, and Catalina Lighting Canada, (1992) Inc./Lumières Catalina Canada (1992) Inc., a Quebec Corporation ("Catalina Canada").

9.      Catalina imports all of its product from Asia. Catalina's wholly-owned subsidiary, Catalina Asia, maintains a sourcing office in Shenzhen, People's Republic of China. Through Catalina Asia, Catalina has established itself as a highly dependable, low-cost producer in the marketplace, while avoiding the fixed costs and capital needs of company-owned production assets.

10.     In the late 1990s, Catalina's financial performance began to weaken due to increased competition, reduced product innovation and poor costs controls.

11.     Catalina continued to experience difficulties throughout the 2000-2006 period due to unusually strong competition and poor management decisions. Those poor decisions led to significant debt.

12.     In late 2006, Gerald Woelcke, Catalina's current CFO, and I were hired to turn around the poor results of Catalina. Mr. Woelcke and I have led Catalina through a series of initiatives that have increased product effectiveness, reduced costs and expanded market share. Improvements include the elimination of unprofitable SKUs, expanded sales responsibilities with respect to key customers, reduction of overlapping headcount, improved cash management, the development of new supplier relationships in China and improved customer service levels. The operational changes and turnaround of poor results were almost completed when the recession hit in late 2008.

13.    The recession hit Catalina and other companies in the consumer lighting industry particularly hard.  The slowdown in building and remodeling has had a very negative impact on sales.  In an effort to ensure that Catalina can succeed in a continued recessionary environment and improve its financial performance, further operational improvement improvements were implemented in 2009.  As a result of these initiatives, Catalina has recorded significant product margin improvements and appears to be well-positioned for future growth.

14.    In the fall of 2008, the Debtors engaged an investment banker, National City Investments ("NatCity"), in order to formulate a strategy to effectively deal with the Debtors' financial situation, as well as to assist the Debtors in connection with a restructuring transaction and/or a sale of the Debtors' assets.  Upon their engagement, NatCity, among other things, immediately worked with the Debtors to prepare a comprehensive confidential investment memorandum ("CIM") in order to assist in the marketing of the Debtors' assets for sale or in raising equity capital.  Among other things, the CIM described the Company's business, growth opportunities and historical financial performance.

15.    To try to generate as much interest in Catalina as possible, NatCity contacted 127 potential buyers.  Unfortunately, due the poor economic climate, both generally and in the lighting sector, only ten of the potential buyers identified by NatCity requested further information.  Although the CIM was provided to all ten of these potential buyers, only two of the potential buyers responded by verbally expressing a further interest in Catalina.  Unfortunately, both of these potential buyers indicated that any offer would require a multi-million dollar loss from the Debtors' secured lender, Wachovia Bank, N.A./Wells Fargo Capital Finance ("Wachovia").  These proposals were not acceptable to Wachovia.

16.    Following NatCity's failure to locate a buyer acceptable to both the Debtors and

their secured lender, Wachovia, the Debtors' management conducted an independent and exhaustive search for a potential buyer. These efforts resulted in the identification of Evolution Lighting, LLC ("Evolution Lighting"), an affiliate of Boyne Capital Partners, Inc., a Miami, Florida based private equity firm focused on acquiring interests in smaller, middle market companies, typically in mature, basic industries, as a potential purchaser for the Debtors' assets. Over the past several months, the Debtors have been negotiating the terms of an agreement to sell substantially all of their assets to Evolution Lighting. On February 25, 2010, these efforts culminated in the execution of an Asset Purchase Agreement ("Purchase Agreement") with Evolution Lighting. The Debtors intend to file a motion in the immediate future to, *inter alia*, obtain court approval of the Purchase Agreement and certain bidding procedures for an auction at which Evolution Lighting will act as the stalking horse bidder.

**B.**     **Capital Structure – The Credit Facility**

17.     Pursuant to that certain Loan and Security Agreement dated as of December 23, 2003 and the amendments thereto, Wachovia made certain loans and advances to the Debtors, establishing a credit facility ("Credit Facility").

18.     The Credit Facility provides that the indebtedness thereunder is secured by, among other things, substantially all of the Debtors' assets, including, without limitation, all accounts receivable, general intangibles, goods, inventory, equipment, fixtures, chattel paper and instruments and deposit accounts.

19.     Generally, the Debtors' customers remit their payments directly into a dedicated lockbox account at Wachovia (Account No. XXXXXXXXX0096) ("Lockbox Account"). Absent the existence of an event of default under the relevant loan documents, the amounts in the Lockbox Account are swept daily by Wachovia and utilized to reduce and pay down the revolving portion of the Credit Facility, thus increasing the Debtor's availability for borrowing

under the current line in accordance with a certain borrowing base formula set forth in the Credit Facility ("Borrowing Base Formula").

20.    As of the Petition Date, the outstanding amount due under the Credit line was approximately $3,136,189.85.

## II.    FACTS IN SUPPORT OF FIRST DAY MOTIONS

21.    Concurrently with the filing of this affidavit, the Debtors are filing a number of applications and motions seeking the entry of orders ("First Day Orders") which the Debtors believe are necessary to enable them to operate in Chapter 11 with a minimum of disruption and loss of productivity.    The Debtors respectfully request that each of the First Day Orders be entered as a critical element in stabilizing and facilitating the Debtors' operations during these Chapter 11 cases.  A brief description of the relief requested and the facts supporting each of the First Day Orders is set forth below.

**DEBTORS' EMERGENCY MOTION FOR THE ENTRY OF AN ORDER (I) AUTHORIZING THE PAYMENT OF PRE-PETITION WAGES, SALARIES, COMMISSIONS AND EMPLOYEE BENEFITS (II) AUTHORIZING THE DEBTORS TO CONTINUE THE MAINTENANCE OF EMPLOYEE PRACTICES AND BENEFIT PLANS AND PROGRAMS IN THE ORDINARY COURSE AND (III) DIRECTING ALL BANKS TO HONOR PRE-PETITION CHECKS FOR PAYMENT OF PRE-PETITION EMPLOYEE OBLIGATIONS**

22.    By this Motion, the Debtors seek an order: (i) authorizing the Debtors to pay pre-petition wages, salaries, commissions and employee benefits; (ii) authorizing the Debtors to continue the maintenance of all employee practices and benefit programs in the ordinary course; and (iii) directing all banks to honor pre-petition checks for payment of pre-petition employee obligations.

23.    As of the Petition Date, the Debtors employed thirty-eight full and part time direct Employees in the United States, including management, operations, customer service, sales, marketing and financial personnel ("U.S. Employees").  A spreadsheet detailing the name of

each U.S. Employee, his or her respective department, his or her gross and net pay, and the taxes

and benefits deducted and paid for each U.S. Employee will be provided to the Court and the

U.S. Trustee in advance of the hearing on this Motion.[2]

24.    Historically, the aggregate gross weekly payroll for the U.S. Employees is

approximately $58,384.68, including company-paid benefits.

25.    Catalina also pays the salary of the employees of its wholly-owned subsidiary,

Catalina Asia.  As of the Petition Date, Catalina Asia employed twenty-eight (28) Employees in

Asia, including management, operations, customer service, quality control and financial

personnel ("Asia Employees").  A spreadsheet detailing the name of each Asia Employee, his or

her respective department, his or her gross and net pay, and the taxes and benefits deducted and

paid for each Asia Employee will be provided to the Court and the U.S. Trustee in advance of the

hearing on this Motion.

26.    Historically, the aggregate gross weekly payroll for the Asia Employees is

approximately $53,802.38, including company-paid benefits

27.    In the ordinary course of their business, and as is customary in the Debtors'

industry, the Debtors offer their employees various benefits, including medical, dental and life

insurance, vacation pay, and other similar benefits.

28.    The Debtors request authorization to honor any and all employee reimbursement

requests with respect to pre-petition business-related expenses incurred, in a manner consistent

with its pre-petition practices.  I believe it would be inequitable and cause an undue hardship if

those employees were required to bear those expenses incurred on behalf of the Debtors.

29.    I believe that the payment to the Debtors' employees of pre-petition employee

---

[2] The spreadsheet will not be attached to the Motion in order to protect the privacy and personal information of the Debtors' Employees.

obligations in accordance with its pre-petition business practices is in the best interests of the estates, creditors, and interest holders and will enable the Debtors to continue to operate their businesses in an efficient manner without disruption.  These payments and the continuation of benefit programs will be crucial to the well being of the Debtors' employees, who are vital to the ongoing businesses and to maximizing recovery for the Debtors' creditors.

**DEBTORS' EMERGENCY MOTION FOR**
**INTERIM AND FINAL ORDERS DETERMINING ADEQUATE**
**ASSURANCE OF PAYMENT FOR FUTURE UTILITY SERVICES**

30.     I understand that Section 366(a) of the Bankruptcy Code prevents utility companies from discontinuing, altering or refusing service to a debtor during the first 20 days of a bankruptcy case.  However, 30 days from the Petition Date, a utility company has the option of terminating its services, pursuant to Section 366(c)(2) of the Bankruptcy Code, if a debtor has not furnished adequate assurance of payment.

31.     By this Motion, the Debtors seek entry of an Order: (i) determining that the Utility Providers have been provided with adequate assurance of payment within the meaning of Section 366 of the Bankruptcy Code; (ii) approving the Debtors' proposed offer of adequate assurance and procedures whereby Utility Providers may request additional or different adequate assurance; (iii) prohibiting the Utility Providers from altering, refusing or discontinuing services on account of prepetition amounts outstanding or on account of any perceived inadequacy of the Debtors' proposed adequate assurance; (iv) establishing procedures for the Utility Providers to seek to opt out of the Debtors' proposed adequate assurance procedures; (v) determining that the Debtors are not required to provide any additional adequate assurance beyond what it proposed by this Motion, pending entry of the Final Order; and (vi) setting a final hearing on the Debtors' proposed adequate assurance.

32.     Uninterrupted utility services are essential to ongoing operations and, therefore, to

the success of these Chapter 11 cases.  Should the Utility Providers refuse or discontinue service, even for a brief period, the Debtors' business operations would be severely disrupted.  The impact on the Debtors' business operations, marketing efforts, revenue and profits would be extremely harmful and would jeopardize the Debtors' restructuring efforts.  It is therefore critical that utility services continue uninterrupted.

33.     I submit that granting the relief requested is both necessary and appropriate, and that, based on the facts of this case, no deposits should be required in addition to the Proposed Adequate Assurance.  Such relief will help the Debtors to successfully restructure and thus fulfill the purposes of Section 105 of the Bankruptcy Code and will not prejudice the rights of the Utility Providers under Section 366 of the Bankruptcy Code.

**EMERGENCY MOTION BY DEBTORS FOR ENTRY
OF AN ORDER AUTHORIZING THE DEBTORS TO PAY PREPETITION
CRITICAL VENDOR CLAIMS IN THE ORDINARY COURSE OF BUSINESS**

34.     By this Motion, the Debtors, pursuant to 11 U.S.C. § 105(a), 363(b), 503(b)(9), 506(b), 546(c), 1107(a), and 1108, Bankruptcy Rules 6003 and 6004 and Local Rule 9013-1(K), seek an order, substantially in the form attached to the Motion as Exhibit A, authorizing, but not directing, the Debtors to pay certain prepetition claims of certain Critical Vendors as requested in the Motion.

35.     The Critical Vendors consist primarily of suppliers representing approximately 93% of all product purchases.  The ability to find alternative suppliers can take up to six to nine months due to tooling, quality control approvals from customers, and Underwriters Laboratory ("UL") approval (which is required to sell a lighting product in the United States).  Each lighting product is unique and requires its own tooling, as well as documented UL testing of each product associated with a specific factory.  The specific product bought from each supplier is unique and must support the continuity of product sold at the retailer's operations.  Catalina's customers will

not accept "similar" products and changes to the product would create a high risk of loss of business and damage to the customer relationships.

36.     As locating alternative suppliers is not a viable option, I recently visited the factory for each Critical Vendor supplier to confirm that they will not interrupt supply. Each Critical Vendor supplier has confirmed it will support the Company during a "short" bankruptcy proceeding involving an expedited sale process, conditioned upon payment of the amounts requested in the Motion. These suppliers have agreed to ship according to schedule based on a proposed weekly payment plan the Debtors presented to them. If there is a disruption in the shipping schedule, then lost sales revenue will occur and create a high risk of permanent loss of business. As part of their support, the Critical Vendor suppliers have also agreed to (i) hold to current payment terms (30 days to 60 days) and (ii) maintain prices at their current levels to assist Catalina in getting through the bankruptcy process as quickly as possible. All the Suppliers have made it clear that they can only sustain their commitments through a bankruptcy process that is very short in duration.

37.     I submit that granting the relief requested is both necessary and appropriate, and request that this Court authorize, but not direct, the Debtors to pay certain prepetition claims of their Critical Vendors as requested in the Motion.

## EMERGENCY MOTION FOR ORDER (1) AUTHORIZING CONTINUED USE OF EXISTING BUSINESS FORMS AND RECORDS; (2) AUTHORIZING MAINTENANCE OF EXISTING CORPORATE BANK ACCOUNTS AND CASH MANAGEMENT SYSTEMS; AND (3) EXTENDING TIME TO COMPLY WITH 11 U.S.C. § 345 <u>INVESTMENT GUIDELINES</u>

38.     I understand that the Office of the United States Trustee has established certain operating guidelines for debtors-in-possession in order to supervise the administration of Chapter 11 cases. These guidelines require Chapter 11 debtors to, among other things, close all existing bank accounts and open new debtor-in-possession ("DIP") bank accounts, establish one DIP

account for all estate monies required for the payment of taxes (including payroll taxes), maintain a separate DIP account for cash collateral, and obtain checks for all DIP accounts that bear the designation, "debtor-in-possession," the bankruptcy case number, and the type of account. The Debtors seek a waiver of these requirements.

39.    I am advised that section 345 of the Bankruptcy Code establishes certain requirements with respect to all deposits and investments of money of the estate. The Debtors seek a 45 day extension of time to comply with the requirements of section 345 or to request a waiver of such requirements.

40.    The Debtors seek a waiver of the requirement that they open a new set of books and records as of the Petition Date because the Debtors respectfully submit that opening a new set of books and records would create unnecessary administrative burdens and would cause unnecessary expense, utilization of resources, and delay. With the use of computer technology, it will be easy to differentiate between pre and post-petition transactions by date. In the ordinary course of their business, the Debtors use many checks, invoices, stationery, and other business forms. By virtue of the nature and scope of the business in which the Debtors are engaged, and the numerous other parties with whom the Debtors deal, the Debtors need to be permitted to use their existing business forms without alteration or change. A substantial amount of time and expense would be required in order to print new checks and other business forms. Fulfillment of the requirement would likely delay payment of post-petition claims and negatively affect operations. Accordingly, the Debtors respectfully request that they be authorized to continue to use their existing business forms and to maintain their existing business records.

41.    The Debtors respectfully request authority to maintain their existing bank accounts (each a "Bank Account" or "Account" and collectively, the "Bank Accounts" or

"Accounts") and cash management systems (each a "Cash Management System" and collectively, the "Cash Management Systems") in accordance with their usual and customary practices to ensure a smooth transition into chapter 11 with minimal disruption to operations.

42.    The Debtors also request authority to close any of the Bank Accounts if, in the exercise of their business judgment, the Debtors determine that such action is in the best interest of their estates.

43.    Only if the Bank Accounts are continued with the same account numbers can the transition into chapter 11 be smooth and orderly, with minimal interference with continuing operations.  In order to conduct their post-petition businesses, the Debtors need to be able to issue checks to vendors, service providers, employees, and others.  To open new accounts and obtain checks for those accounts will cause delay and disruption to the Debtors' business. Moreover, as discussed above, a change in the Accounts to which customers wire and route payments could delay the Debtors' receipt of funds needed for operations.  By preserving business continuity and avoiding the operational and administrative paralysis that would result from closing the existing Bank Accounts and opening new ones, all parties-in-interest, including employees, vendors, and customers, will be best served, and the benefit to the Debtors' estates will be considerable.  The confusion that would otherwise result could only work to the detriment of these chapter 11 cases. (Of course, no checks issued prior to the Petition Date are to be honored, except as otherwise provided by separate order of this Court.)

44.    The Debtors will continue to maintain records respecting all transfers between and among the Bank Accounts so that all transactions can be ascertained after they have occurred.  In addition, the Debtors will instruct their banks to add the designation, "Debtor-in-Possession or "DIP" to their current and any future Accounts with each such bank, will treat the

12

Accounts for all purposes as Accounts of the Debtors as DIPs, and will maintain records that recognize the distinction between pre-petition and post-petition transfers. The Debtors believe that their current cash and investments are relatively safe because the Debtors' financial institutions are, upon information and belief, financially stable.

45.     Due to the significant amounts of money that may be in the Bank Accounts from time to time, it would take some time for the Debtors to locate and determine, where necessary, appropriate alternative accounts that satisfy section 345(b). Therefore, Debtors seek a reasonable extension of time to meet the requirements of section 345(b).

## APPLICATION OF DEBTORS-IN-POSSESSION FOR ORDER AUTHORIZING EMPLOYMENT OF SHUTTS & BOWEN LLP AS COUNSEL TO THE DEBTORS, *NUNC PRO TUNC* TO PETITION DATE

46.     By this Application, the Debtors seek to employ and retain Peter H. Levitt and Stephen P. Drobny and the law firm of Shutts & Bowen LLP ("S&B"), on an emergency basis, as their general restructuring and bankruptcy counsel with regard to the filing of their Chapter 11 petitions and the prosecution of their Chapter 11 cases. Accordingly, the Debtors respectfully request the entry of an interim and final order pursuant to Section 327(a) of the Bankruptcy Code authorizing them to employ and retain Peter H. Levitt and Stephen P. Drobny and S&B as their attorneys under a general retainer to perform the legal services that will be necessary during their Chapter 11 cases as more fully described below.

47.     Prior to the commencement of these Chapter 11 cases, the Debtors sought the services of S&B with respect to, among other things, advice regarding restructuring matters in general, and preparation for the potential commencement and prosecution of Chapter 11 cases for the Debtors. The Debtors believe that continued representation by their pre-petition restructuring counsel, S&B, is critical to the Debtors' efforts to restructure their business because S&B has extensive experience and expertise in complex commercial reorganization cases and

has become familiar with the Debtors' business, legal and financial affairs. Accordingly, S&B is well-suited to guide the Debtors through the Chapter 11 process.

48.     Except as set forth in the Declaration of Peter H. Levitt in support of this Application, to the best of the Debtors' knowledge, the shareholders, counsel and associates of the firm of S&B: (a) do not have any connection with any of the Debtors, their affiliates, their creditors, the U.S. Trustee, any person employed in the office of the U.S. Trustee, or any other party in interest, or their respective attorneys and accountants; (b) are "disinterested persons," as that term is defined in Section 101(14) of the Bankruptcy Code; and (c) do not hold or represent any interest adverse to the Debtors' estate.

## MOTION FOR AN ADMINISTRATIVE ORDER PURSUANT TO 11 U.S.C. §§ 105(A) AND 331 ESTABLISHING PROCEDURES FOR INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES OF PROFESSIONALS

49.     The Debtors request the entry of an order authorizing and establishing procedures for the compensation and reimbursement of expenses to court approved professionals on a monthly basis. Such an order will streamline the professional compensation process and enable the Court and all other parties to monitor the professional fees and expenses incurred in these Chapter 11 cases more effectively.

50.     I believe that the procedures suggested in this Motion will enable the Debtors to closely monitor the costs of administration, maintain a level cash flow, and implement efficient cash management procedures. Moreover, these procedures will also allow the Court and the key parties in interest to insure the reasonableness and necessity of the compensation and reimbursement sought pursuant to such procedures.

## MOTION FOR AN ORDER PURSUANT TO BANKRUPTCY RULE 1007(C) GRANTING AN EXTENSION OF TIME TO FILE STATEMENT OF FINANCIAL AFFAIRS AND SCHEDULES OF ASSETS AND LIABILITIES

51.     Under Bankruptcy Rule 1007(c), the Debtors are required to file their Statements

14

and Schedules within fifteen (15) days after the Petition Date. To prepare the Statements and Schedules, the Debtors must gather information from books, records, and documents relating to thousands of transactions. The collection of the information necessary to complete the Statements and Schedules will require an expenditure of substantial time and effort on the part of the Debtors' employees.

52.    In the days and weeks leading up to the filing of these Chapter 11 Cases, the Debtors' key management has been entirely occupied in pursuing strategic alternatives, negotiating the Purchase Agreement and potential post-petition financing, negotiating with suppliers and preparing information and documents necessary to prepare the Debtors' chapter 11 filings. In the early days of these cases, the Debtors anticipate that their key management and other employees will have many competing demands as they endeavor to implement the Debtors' restructuring efforts, while also addressing a myriad of employee, customer, and vendor issues. Under these circumstances, it appears unlikely that the Debtors will be able to complete their Statements and Schedules properly and accurately by the ordinary fifteen-day deadline.

53.    Accordingly, the Debtors request that the Court extend the period under Bankruptcy Rule 1007(c) for an additional twenty (20) days, thereby setting the deadline to file the Statement and Schedules to thirty-five (35) days after the Petition Date, until April 1, 2010.

**EX PARTE MOTION FOR AUTHORITY TO
FILE CONSOLIDATED CASE MANAGEMENT SUMMARY**

54.    I am advised that in accordance with Administrative Order 05-1, dated May 20, 2005, the debtor in possession in a Chapter 11 case is directed to file with the Court and serve all parties of record, within the earlier of three business days after relief is entered, or one business day prior to the date of the first scheduled hearing, a completed local form Chapter 11 Case Management Summary ("Case Management Summary") providing certain information regarding

15

the assets, liabilities and financial affairs of Chapter 11 debtors. These Chapter 11 cases were commenced by Catalina and its affiliate, Catalina Industries.

55.    Contemporaneously herewith, the Debtors have each filed in their respective Chapter 11 cases ex-parte motions seeking joint administration of these Chapter 11 cases. The Debtors request that the Court authorize them to file a consolidated Case Management Summary, reflecting the assets, liabilities and financial information for each of the Debtors. The Debtors request authority to file a consolidated Case Management Summary, as the filing of a separate Case Management Summary for each of the numerous Debtors would be burdensome. In addition, much of the information contained in the Case Management Summary is duplicative for the Debtors and the filing of a consolidated Case Management Summary is more efficient and will provide the Court and parties-in-interest with adequate disclosures regarding the assets and liabilities of each Debtor.

## EX-PARTE MOTIONS FOR JOINT ADMINISTRATION

56.    The Debtors seek orders directing the joint administration of their chapter 11 cases for procedural purposes only, including the joint filing of any disclosure statements and plans of reorganization and other contested matters.

57.    The Debtors are "affiliates" as I understand that term as defined in section 101(2)(A) of the Bankruptcy Code.

58.    The issues that will be addressed in these bankruptcy cases will be related and overlapping. Joint administration of these cases will obviate the need for duplicative notices, motions, applications, hearings and orders, and will therefore save considerable time and expense for the Debtors and their estates.

59.    Each creditor may still file its claim against a particular estate. I believe the rights of all creditors will actually be enhanced by the reduction in costs resulting from joint

administration.  The Court also will be relieved of the burden of scheduling duplicative hearings, entering duplicative orders and maintaining redundant files.  Finally, I believe supervision of the administrative aspects of these chapter 11 cases by the Office of the United States Trustee will be simplified.

60.    Accordingly, for the reasons stated herein and in each of the first day applications, the Debtors respectfully request that First Day Motions be approved.

**DEBTORS' EMERGENCY MOTION FOR AUTHORITY TO SELL CERTAIN RECEIVABLES UNDER PRIMEREVENUE FACTORING AGREEMENT**

61.    By this Motion, the Debtors seek an Order authorizing, but not instructing, the Debtors to sell certain Receivables pursuant to a Factoring Agreement, from time to time, as the Debtors, in their discretion, deem fit.

62.    In or around the summer of 2009, the Debtors entered into a Supplier Agreement with PrimeRevenue, Inc., a Delaware corporation ("PrimeRevenue"), and an Accounts Receivable Purchase Agreement with Bank of America, N.A. ("BOA").  True and correct copies of the Supplier Agreement and the Receivables Purchase Agreement, referred to collectively hereinafter as the "Factoring Agreement", are attached hereto as Composite Exhibit A.

63.    The Factoring Agreement permits the Debtors, at their election, to sell certain account receivables ("Receivables") owed by Lowe's Companies, Inc. ("Lowes") to BOA.  Upon the sale of a Receivable, the Debtors will receive the full amount due and owing on account of such Receivable, less a small processing fee.  The Debtors will then be responsible for paying BOA interest on the amount of the Receivable for the period of acceleration, typically ninety (90) days or less, at an interest rate of approximately two percent (2.00%) per annum

64.    The Debtors have been utilizing the Factoring Agreement in the ordinary course of their business operations for a period of approximately six months.  The Debtor's sale of

Receivables under the Factoring Agreement has significantly improved the Debtor's liquidity.

65.    The Debtors will need the liquidity afforded by the Factoring Agreement in order to continue to operate their business and preserve their ongoing, enterprise value through the sale of substantially all of their assets.  In light of the extremely modest interest rate, the Factoring Agreement provides the most cost-effective means for the Debtors to improve their liquidity.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed on this 26th day of February, 2010 in the County of Miami-Dade, State of Florida.

A. Corydon Meyer
Chief Executive Officer and President
Catalina Lighting, Inc. and Catalina Industries, Inc.