**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
www.flsb.uscourts.gov

In re:

Catalina Lighting, Inc., *et al.*,[1]

Debtors.

_____/

Chapter 11

Case No. 10-14786-RAM

(Joint Administration Pending)

**DEBTORS' MOTION FOR ENTRY OF ORDERS PURSUANT TO SECTIONS 105, 363 AND 365 OF THE BANKRUPTCY CODE AND FEDERAL RULES OF BANKRUPTCY PROCEDURE 2002, 6004, AND 6006 (A) APPROVING ASSET PURCHASE AGREEMENT WITH EVOLUTION LIGHTING, LLC, AN AFFILIATE OF BOYNE CAPITAL PARTNERS, INC., (B) ESTABLISHING BIDDING PROCEDURES FOR THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND INTERESTS; (C) AUTHORIZING THE DEBTORS TO PROVIDE CERTAIN STALKING HORSE BID PROTECTIONS; (D) SCHEDULING A HEARING TO CONSIDER THE APPROVAL OF AND APPROVING THE SALE OF ALL OR SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS; (E) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES AT THE SALE HEARING, (F) APPROVING THE FORM AND MANNER OF NOTICE IN CONNECTION THEREWITH AND (G) GRANTING RELATED RELIEF**

**(Hearing Requested on or Prior to March 10, 2010)**

**Basis for Emergency Hearing**

The Debtors seek (i) to continue to operate their business, (ii) to preserve the value of their bankruptcy estates, (iii) to protect eighty-one jobs, and (iv) to facilitate the completion by the Debtors of an extensive pre-petition marketing and sales process in connection with the proposed sale of all or substantially all of the Debtors' assets as a going concern to a "stalking horse" selected by the Debtors immediately prior to the filing of these Chapter 11 cases, subject to higher and better bids under Section 363 of the Bankruptcy Code. They respectfully request an emergency hearing on this motion on or before March 10, 2010 to avoid

---

[1] The Debtors are the following two (2) entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Catalina Lighting, Inc., a Florida corporation (8266); and Catalina Industries, Inc., a Florida corporation (4785). The address of each of the Debtors is 18191 NW 68th Avenue, Hialeah, FL 33015.

irreparable harm to their estates and to comply with the deadlines set forth in the Purchase Agreement with the "stalking horse" bidder.

Debtors, Catalina Lighting, Inc. ("Catalina") and Catalina Industries, Inc. ("Catalina Industries") (collectively, "Debtors"), by and through undersigned counsel, file this motion ("Motion") for the entry of an order, pursuant to 11 U.S.C. §§ 105, 363, and 365 and Fed. R. Bankr. P. 2002, 6004, and 6006, (a) approving that certain Asset Purchase Agreement, dated February 25, 2010 ("Purchase Agreement"), by and among the Debtors, as sellers, and Evolution Lighting, LLC, an affiliate of Boyne Capital Partners, Inc., as buyer ("Evolution Lighting" or "Stalking Horse Bidder"), for the purchase and sale of the Purchased Assets (as defined below), which Purchase Agreement (less Exhibits and Schedules[2]) is attached hereto as Exhibit A, (b) establishing bidding procedures for the sale of the Purchased Assets free and clear of all liens, claims, encumbrances and interests pursuant to Section 363(f) of the Bankruptcy Code, (c) authorizing the Debtors to provide certain "stalking horse" bid protections to the Stalking Horse Bidder, (d) scheduling a hearing ("Sale Hearing") to consider approval of, and approving, the sale of the Purchased Assets pursuant to Sections 363 and 365 of the Bankruptcy Code free and clear of all liens, claims, encumbrances and interests pursuant to the Purchase Agreement to the Stalking Horse Bidder or the highest and best bidder, if applicable, at an Auction (as defined below), (e) authorizing the Debtors' assumption and assignment of certain executory contracts and unexpired leases in connection therewith at the Sale Hearing, (f) approving the form and manner of notice thereof, and (g) granting related relief.

---

[2] **THE EXHIBITS AND SCHEDULES TO THE PURCHASE AGREEMENT ARE NOT ATTACHED TO THE MOTION AS THEY ARE VOLUMINOUS.  HOWEVER, COPIES OF THE EXHIBITS AND SCHEDULES MAY BE OBTAINED UPON WRITTEN REQUEST TO THE UNDERSIGNED COUNSEL.  IN ADDITION, A COMPLETE COPY OF THE PURCHASE AGREEMENT WILL BE FILED WITH THE COURT AND MAY BE ACCESSED THROUGH THE COURT'S PACER WEBSITE.**

In support of the Motion, the Debtors rely on the Declaration of A. Corydon Meyer, Chief Executive Officer ("Mr. Meyer"), in Support of Chapter 11 Petitions and First Day Motions ("Meyer Declaration"). In further support of this Motion, the Debtors respectfully state as follows:

## JURISDICTION AND VENUE

1.      The Court has jurisdiction to consider this Motion and to grant the relief requested herein pursuant to 28 U.S.C. §§ 157 and 1334.  Venue is proper in this district pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b).

## PRELIMINARY STATEMENT

2.      By this Motion, the Debtors respectfully request court approval of a sales process through which the Debtors desire to pursue the sale of the Purchased Assets, which Purchased Assets represent substantially all of their assets, through a competitive bidding process pursuant to the terms of the Purchase Agreement with the Stalking Horse Bidder, subject in all events to higher and better bids pursuant to the Bidding Procedures set forth below.

3.      For the reasons discussed below, the Debtors have concluded, in the exercise of their best business judgment, that the sale of all or substantially all of their assets is in the best interests of the Debtors, their bankruptcy estates and their creditors. Prior to coming to such conclusion, the Debtors explored several strategic alternatives, including a diligent search for an equity investment to support their business operations, a restructuring of the secured debt, a sale of substantially all of their assets as a going concern and/or an orderly liquidation of their assets. An evaluation of all of these options led the Debtors to the conclusion that a sale of substantially all of their assets will maximize the value of their bankruptcy estates.

4.      The Debtors have obtained DIP financing ("DIP Loan"), subject to Court approval, to cover anticipated shortfalls through the closing of the sale of the Purchased Assets

which, pursuant to the terms of the Purchase Agreement, must occur on or before May 14, 2010. The amount and terms of such DIP Loan are directly tied to the deadline for closing on the sale of the Purchased Assets.  The sooner the Debtors can consummate such closing, then the lower the amount the Debtors will need to draw on their line under the DIP Loan.  Further, a fast exit from bankruptcy is essential to preserving the value of the business as a going concern.  Under these circumstances, the Debtors respectfully submit that it is in the best interest of their estates to expedite the sale process as set forth below.

5.    Pursuant to the terms of the Purchase Agreement with the Stalking Horse Bidder, the Debtors' estates expect to realize substantial consideration from such sale as more fully set forth in the attached Purchase Agreement.  The salient terms of the Purchase Agreement are as follows:[3]

- The Purchased Assets include substantially all of the Debtors' assets, including without limitation: all Inventory[4]; all Accounts Receivable; all Leased Real Property; all Equipment; all rights under Assumed Contracts; all Intellectual Property Rights owned by or used by the Sellers, all goodwill relating to the Business; all refunds, deposits, prepayments and prepaid expenses relating to any Assumed Contracts; all claims, causes of action, choses in action, rights of recovery or setoff of any kind against any Person who holds an Assumed Liability; and all Books and Records;

- The Excluded Assets include, among other things, (i) any Contract that is not an Assumed Contract, (ii) any Avoidance Actions (other than against Transferred Employees), (iii) the right to the Purchase Price and other rights granted to the Sellers under this Agreement, (iv) all rights and claims in or to any refunds or credits of or with respect to any Taxes, assessments or similar charges paid by or on behalf of the Sellers, in each case to the extent applicable to any period prior to the Closing Date (but not any of the foregoing paid by the Stalking Horse Bidder), (v) the Excluded Books and Records, (vi) all claims arising prior to the Closing Date under any directors and officers liability insurance policies owned by the Sellers, (vii) professional retainers paid by the Sellers, (viii) any intercompany

---

[3] All parties are urged to read the Purchase Agreement in its entirety as this summary is qualified by the Purchase Agreement. In the event of any inconsistencies between this summary and the Purchase Agreement, the terms of the Purchase Agreement shall control.

[4] Capitalized terms not otherwise defined herein shall have the same meanings ascribed to them in the Purchase Agreement.

receivable or other amount owed to any Seller by any other Seller or by any Affiliate of any Seller, (ix) any amounts that have been placed into escrow accounts for the benefit of professionals, (x) the Capital Stock of each Seller, and (xi), the Carve-Out Reserve;

· The Stalking Horse Bidder is assuming certain liabilities of the Debtors, including (i) all liabilities and obligations arising with respect to periods commencing after the Closing Date under or pursuant to any Assumed Contracts and which relate to the performance of the Assumed Contracts on and after the Closing Date (other than any obligations or liabilities that are the result of the breach of any Assumed Contract prior to or on the Closing Date), (ii) all liabilities and obligations occurring, arising out of or related to the ownership and operation of the Business and the Purchased Assets after the Closing Date, (iii) the current Critical Vendor Amounts that are unpaid as of the Closing Date, provided that the Stalking Horse Bidder decides to use such vendors and such vendors agree to maintain current payment terms and pricing and continue to ship ordered goods, (iv) up to two weeks of all accrued, but unpaid wages of the Transferred Employees that are paid bi-monthly pursuant to the Sellers' standard payroll, together with the corresponding payroll taxes, and (v) liabilities to customers under the Sellers' general ledger account "Sales Allowances – Non Contractual";

· The purchase price for the Purchased Assets and the Canadian Assets shall be the Senior Debt Amount, plus the $40,000 fee charged by the Senior Creditors as a financing fee for the DIP Loan (collectively, the "Cash Purchase Price"), plus the Assumed Liabilities, plus the Canadian Assumed Liabilities (collectively, with the Cash Purchase Price, the "Purchase Price"). The Cash Purchase Price shall be allocated fifty-three percent (53%) to the Purchased Assets pursuant to this Agreement and forty-seven percent (47%) to the Canadian Assets pursuant to the Canadian Agreement;

· A cash deposit of $200,000 has been paid by the Stalking Horse Bidder;

· All Cure Costs associated with the assumption and assignment of Assigned Contracts shall be paid at or prior to the Closing Date; and

· A Break-Up Fee in the amount of $600,000 (which also includes expense reimbursement).

## **BACKGROUND**

**A.** **Introduction.**

6. On February 25, 2010 ("Petition Date"), the Debtors filed voluntary petitions in this Court for relief under Chapter 11 of the Bankruptcy Code. The Debtors continue to operate

their businesses as Debtors-in possession pursuant to Sections 1107(a) and 1108 of Title 11 of the United States Code ("<u>Bankruptcy Code</u>").

7.      No creditors' committee has yet been appointed in these cases. In addition, no trustee or examiner has been appointed.

8.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.  This matter is a core proceeding pursuant to 28 U.S.C. § 157(b).

9.      The statutory predicates for the relief requested herein are sections 105(a), 363, and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006 and 9014.

> **B.      <u>Background and Current Business Operations.</u>**

10.      Catalina is a Florida corporation engaged in the design, marketing and distribution of a broad line of high quality and innovative consumer lighting products in the United States and Canada.  With some of the most recognizable names in the industry, such as Catalina™, Dana™, Illuminada™, VisionMax™ and Tensor®, Catalina's customers include do-it-yourself home centers, national retail chains, office superstore chains, mass merchandisers, warehouse clubs, discount department stores and hardware stores.  Catalina has established relationships with top national retailers such as Lowes, WalMart, Sears, OfficeMax, Staples, Bed Bath & Beyond, Kmart, Ace Hardware, Canadian Tire and Rona.

11.      Catalina's headquarters are located in Miami, Florida.  In order to support its sales and distribution efforts in the U.S. and Canada, Catalina leases warehouses in Tupelo, Mississippi and Mississauga, Canada.  Catalina also maintains a sales office in Mooresvillle, North Carolina and a showroom in Highpoint, North Carolina.

12.     Catalina's North American Operations are conducted through its wholly-owned subsidiaries, Catalina Industries, a Florida corporation, and Catalina Lighting Canada, (1992) Inc./Lumières Catalina Canada (1992) Inc., a Quebec Corporation ("Catalina Canada").

13.     Catalina imports all of its product from Asia.  Catalina's wholly-owned subsidiary, Catalina Asia, maintains a sourcing office in Shenzhen, People's Republic of China. Through Catalina Asia, Catalina has established itself as a highly dependable, low-cost producer in the marketplace, while avoiding the fixed costs and capital needs of company-owned production assets.

14.     In the late 1990s, Catalina's financial performance began to weaken due to increased competition, reduced product innovation and poor costs controls.

15.     Catalina continued to experience difficulties throughout the 2000-2006 period due to unusually strong competition and poor management decisions.  Those poor decisions led to significant debt.

16.     In late 2006, A. Corydon Meyer and Gerald Woelcke, Catalina's current CEO and CFO respectively, were hired to turn around the poor results of Catalina.  Mr. Meyer and Mr. Woelcke have led Catalina through a series of initiatives that have increased product effectiveness, reduced costs and expanded market share.  Improvements include the elimination of unprofitable SKUs, expanded sales responsibilities with respect to key customers, reduction of overlapping headcount, improved cash management, the development of new supplier relationships in China and improved customer service levels.  As a result of these initiatives, Catalina has recorded significant product margin improvements and appears to be well-positioned for future growth.

C.      **Prepetition, the Debtors Aggressively Marketed the Debtors' Businesses and Assets as a Going Concern.**

17.      In the fall of 2008, the Debtors engaged an investment banker, National City Investments ("NatCity"), in order to formulate a strategy to effectively deal with the Debtors' financial situation, as well as to assist the Debtors in connection with a restructuring transaction and/or a sale of the Debtors' assets. Upon their engagement, NatCity, among other things, immediately worked with the Debtors to prepare a comprehensive confidential investment memorandum ("CIM") in order to assist in the marketing of the Debtors' assets for sale or in raising equity capital. Among other things, the CIM described the Company's business, growth opportunities and historical financial performance.

18.      To try to generate as much interest in Catalina as possible, NatCity contacted 127 potential buyers. Unfortunately, due the poor economic climate in the lighting sector, only ten of the potential buyers identified by NatCity requested further information. Although the CIM was provided to all ten of these potential buyers, only two of the potential buyers responded by verbally expressing a further interest in Catalina. Unfortunately, both of these potential buyers indicated that any offer would require a multi-million dollar loss from the Debtors' secured lender, Wachovia Bank, N.A./Wells Fargo Capital Finance ("Wachovia"). These proposals were not acceptable to Wachovia.

19.      Following NatCity's failure to locate a buyer acceptable to both the Debtors and their secured lender, Wachovia, the Debtors' management conducted an independent and exhaustive search for a potential buyer. These efforts resulted in the identification of Evolution Lighting as a potential purchaser for the Debtors' assets. Over the past several months, the Debtors have been negotiating in good faith the terms of an agreement to sell substantially all of their assets to Evolution Lighting. On February 25, 2010, these efforts culminated in the

execution of an Asset Purchase Agreement ("Purchase Agreement") with Evolution Lighting. Concurrently herewith, the Debtors are filing a motion to, *inter alia*, obtain court approval of the Purchase Agreement and certain bidding procedures for an auction at which Evolution Lighting will act as the Stalking Horse Bidder. The offer embodied in the Purchase Agreement is substantially better than any of the "proposals" that were elicited from potential buyers identified by NatCity in that it will, inter alia, satisfy the Debtors' secured debt in full. Moreover, Evolution Lighting has committed itself to retaining the Debtor's employees, which will ensure that eighty-one jobs are preserved.

20.     Under the Purchase Agreement, Evolution Lighting will act as the Debtor's "stalking horse" bidder. Evolution Lighting is an affiliate of Boyne Capital Partners, Inc., a Miami, Florida based private equity firm focused on acquiring interests in smaller, middle market companies, typically in mature, basic industries. In addition to traditional transaction structures, the firm has significant expertise in acquiring companies in distress or emerging from bankruptcy.

21.     In order to maximize the value of the Purchased Assets through a bidding process while meeting the strict timetable necessitated by the Debtors' cash needs and the Purchase Agreement, it is essential that Bidding Procedures contained herein be established and approved on an expedited basis.

## PROPOSED BIDDING PROCEDURES

### A.     Bidding Procedures.

22.     The Debtors submit that their extensive pre-petition marketing efforts have reached many of the individuals who might have an interest in acquiring the Debtors' assets. Throughout the pre-petition marketing process, these potential purchasers have had access to a substantial amount of due diligence and information on the Debtors and their assets, and have

had the opportunity to fully and completely evaluate the Debtors' business. The Bidding Procedures proposed herein by the Debtors, while recognizing the limited time available in light of the Debtors' financial situation, seek to ensure that any other prospective purchasers for the Debtors' assets are likewise identified, encouraged to participate in the sale process and are provided with the requisite information to enable such prospects to so participate. Moreover, these bidding procedures are designed to provide sufficient notice to potential purchasers and otherwise to ensure a transparent sale process.

23.    The Debtors respectfully request that the Court approve the expedited bidding procedures set forth below ("Bidding Procedures"). The Bidding Procedures are designed to afford potential competing bidders an adequate opportunity to conduct due diligence and to submit a bid to purchase the Debtors' assets. If, by the bid deadline set by the Court ("Bid Deadline"), there is one or more Qualified Bidders (as defined in the Bidding Procedures), then the Debtors will conduct an auction sale on a date and time to be set by the Court ("Auction"). After the Auction, and as soon as the Court can schedule a hearing ("Sale Hearing"),[5] the Debtors will seek approval of the highest and best bid at the Auction, which bid will be determined by the Debtors in the exercise of their best business judgment in accordance with the Bidding Procedures. At the Sale Hearing, the Debtors propose to seek approval of the Auction sale of the Purchased Assets to the Winning Bidder pursuant to Sections 363 and 365 of the Bankruptcy Code, free and clear of all liens, claims, encumbrances and interests, pursuant to the Purchase Agreement.

24.    The Bidding Procedures proposed by the Debtors are as follows:

---

[5] Pursuant to the Purchase Agreement with the Stalking Horse Bidder, the order approving the sale of the Purchased Assets must be entered and final on or before May 7, 2010 or the Stalking Horse Bidder will have the right to terminate the Purchase Agreement. The Purchase Agreement imposes other deadlines relating to the sale process and imposes a closing deadline of May 14, 2010.

BIDDING PROCEDURES[6]

 The following procedures (the "Bidding Procedures") shall govern the sale and auction of certain of the assets and/or business operations of Catalina Lighting, Inc., Catalina Merchandising, Inc., Catalina Industries, Inc., Meridian Lamps, Inc., The Shetland Company, Inc., and Tensor Corporation (collectively referred to as the "Debtors") to Evolution Lighting, LLC or its nominee (the "Stalking Horse Bidder") or any competing bidder.  These Bidding Procedures have been approved and authorized by order dated March ___, 2010 (the "Procedures Order") of the United States Bankruptcy Court for the Southern District of Florida (the "Bankruptcy Court") in the jointly administered chapter 11 cases of the Debtors (Case No. 10-14786-RAM).  Capitalized terms, used herein but not separately defined, shall have the meanings ascribed to such terms in that certain Purchase Agreement by and between the Stalking Horse Bidder and the Debtors dated February 25, 2009 (the "Agreement").

 1. Property to be Sold.  Pursuant to the Agreement, the Stalking Horse Bidder has agreed to purchase all of the Debtors' right, title and interest in, to and under all of the properties, assets and other rights (other than the Excluded Assets) which constitute the Purchased Assets as defined in the Agreement.  As provided in the Procedures Order, the sale of the Purchased Assets (the "Asset Sale") is subject to a determination of which entity is the Winning Bidder (as defined in Section 9 below).  The Stalking Horse Bidder shall be treated as a Qualified Bidder (as defined in Section 3 below), and the Agreement shall be treated as a Qualified Bid (as defined in Section 5 below), for all purposes under the Bidding Procedures.

 2. Due Diligence.  Upon receipt by Shutts & Bowen LLP ("Debtors' Counsel") of (i) an executed confidentiality agreement ("Confidentiality Agreement") containing terms substantially similar to the terms set forth in Section 5.8 of the Purchase Agreement; (ii) a completed and executed bidder information sheet (form to be provided upon request), and (iii) evidence satisfactory to the Debtors that the potential bidder is reasonably likely to be able to consummate a purchase of the Purchased Assets, all in form and substance satisfactory to the Debtors in their sole discretion, a potential bidder shall be provided with additional information regarding the Purchased Assets and the Debtors' operations and financial condition, and shall be afforded the opportunity to inspect the Purchased Assets.  In addition, all reasonable efforts shall be made to provide a potential bidder, who has satisfied the conditions of this Section 2, with such information as such potential bidder may reasonably determine is necessary or relevant to the formulation of its bid.

**DEBTORS' COUNSEL HAS NOT PREPARED ANY OF THE INFORMATION REGARDING THE DEBTORS, OR ANY OF ITS OPERATIONS, ASSETS OR FINANCIAL CONDITION TO BE PROVIDED TO A POTENTIAL BIDDER IN CONNECTION WITH THE PROCEDURES SET FORTH HEREIN. CONSEQUENTLY, NO REPRESENTATION IS MADE BY THE DEBTORS' COUNSEL REGARDING THE ACCURACY, RELIABILITY, VERACITY, ADEQUACY, OR COMPLETENESS OF ANY INFORMATION PROVIDED IN CONNECTION WITH**

---

[6] The final auction and bidding procedures will be set forth in a notice and order to be entered by the Bankruptcy Court and may vary from the text set forth herein.  However, the Debtors do not anticipate that the procedures will change in any material manner.

THE BIDDING PROCEDURES, AND ALL POTENTIAL BIDDERS ARE ENCOURAGED TO CONSULT WITH THEIR OWN ADVISORS REGARDING ANY SUCH INFORMATION.

3.        Qualified Bidders.

(a)  A potential bidder that satisfies the following requirements, and that the Debtors determine is reasonably likely to be able to consummate a purchase of the Purchased Assets shall be considered a "Qualified Bidder."  Within three (3) Business Days of each potential bidder's delivery of all of the material required in subsections (b)(i) through (b)(v) below, the Debtors shall notify such potential bidder in writing as to whether such potential bidder shall be considered a Qualified Bidder.

(b)  Unless otherwise ordered by the Bankruptcy Court for cause shown, no bid for the Purchased Assets will be considered unless prior to or in conjunction with making such bid, the bidder delivers the following items to Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131, Attn.: Stephen P. Drobny, Esq.

(i)        An executed confidentiality agreement as provided in Section 2 of these Bidding Procedures;

(ii)        A completed and executed bidder information sheet (to be provided upon request) in form and substance satisfactory to the Debtors in their sole discretion;

(iii)        The most recent financial statements of the potential bidder, or, if the potential bidder is an entity formed for the purpose of acquiring the Purchased Assets, current financial statements of the equity holder(s) of the potential bidder, and such other financial disclosure acceptable to, and requested by, the Debtors, which information shall demonstrate the financial capability of the potential bidder to consummate the purchase of the Purchased Assets (including evidence that the bidder has adequate financing for the transaction), and to provide "adequate assurance of future performance," within the meaning of section 365(f)(2)(B) of title 11 of the Bankruptcy Code of any executory contracts and unexpired leases to be assumed and assigned to such bidder should the potential bidder be the Winning Bidder. If the prospective bidders (or the equity holders of an acquisition entity formed to be a prospective bidder), have financial statements that are audited by outside accountants, the financial statements required hereby shall be audited financial statements.  In any event, an authorized representative of the bidder shall certify that the financial statements required hereby are true and correct;

(iv)        Evidence that the potential bidder has the necessary internal authorizations and approvals necessary to engage in the transaction without the consent of any entity that has not already been obtained; and

(v)        A cashier's check made payable to Shutts & Bowen LLP, as Escrow Agent, or cash paid to Shutts & Bowen, LLP, as Escrow Agent, in an amount not less than $200,000 ("Deposit").  The bidder shall forfeit the Deposit if (i) the bidder is determined to be a Qualified Bidder and withdraws or modifies its bid or any subsequent

Increased Bid (as defined below) before the Bankruptcy Court approves the Debtors' selection of the Winning Bidder, and/or (ii) the bidder is determined to be the Winning Bidder and (A) modifies or withdraws the bid or any subsequent Increased Bid without the Debtors' consent before the consummation of the sale contemplated by the Competing Agreement (as defined below) or (B) breaches the Competing Agreement. The Deposit shall be returned to the bidder (i) if the bidder is determined not to be a Qualified Bidder or (ii) if the bidder complies with all of the requirements of the Bidding Procedures and is determined not to be the Winning Bidder.

4.    Time for Submission of Bids. Any Qualified Bidder that desires to participate in the Auction (as defined in Section 8 below) shall deliver a copy of its bid not later than 4:00 p.m. Eastern Standard Time on _____[7], 2010 ("Initial Bid Deadline") to (i) Debtors' Counsel, Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131, Attn.: Stephen P. Drobny, Esq., Fax: (305) 415-9847, email: sdrobny@shutts.com; and (ii) Counsel for Evolution Lighting, White & Case LLP, 200 South Biscayne Boulevard, Suite 4900, Miami, FL 33131, Attn: Thomas E. MacWright Esq., Fax: (305) 358-5744, email: tmacwright@whitecase.com.

The Debtors shall have the right to extend the Initial Bid Deadline once or successively, but not later than to a date which is two (2) Business Days prior to the commencement of the Auction, but shall be under no obligation to do so. In the event the Debtors elect to extend the Initial Bid Deadline, all Qualified Bidders shall be notified promptly of such extension.

5.    Form and Content of Bids. To constitute a "Qualified Bid," a bid, other than the bid of Stalking Horse Bidder, must satisfy the following requirements:

(a)  The bid must include an executed definitive asset purchase agreement for the purchase of all of the Purchased Assets and assumption of all Assumed Liabilities, which shall be made upon terms and conditions substantially similar to and no less economically favorable to the Debtors than those contained in the Agreement, and must be accompanied by a form of the Agreement that specifically sets forth those amendments and modifications to the Agreement, including price, terms, agreements to be assumed, and liabilities not to be assumed, which such bidder would propose if it were selected as the Winning Bidder ("Competing Agreement"). All modifications or amendments to the Agreement that are contained in the Competing Agreement must be "red lined" or marked in order to be enforceable against the Debtors.

(b) The Competing Agreement must provide for total net consideration consisting of cash, exclusive of the Assumed Liabilities, to the Debtors' estates of not less than an amount equal to the sum of (i) $100,000, (ii) the Senior Debt Amount, and (iii) the Break-Up Fee ($600,000).[8]

---

[7] This date and certain other dates referred to herein have not yet been set by the Bankruptcy Court. The actual dates will be included in the Notice of Sale upon this Court's approval of these Bidding Procedures.

[8] The Senior Debt Amount totals $3,302,043 as of February 24, 2010. However, the Senior Debt Amount is based on a revolving line of credit and fluctuates on a daily basis. Prior to the Auction, Qualified Bidders may obtain the then current Senior Debt Amount by contacting Debtors' Counsel, Stephen P. Drobny, Esq.

(c)  The Competing Agreement must not be conditioned on the ability of the bidder to obtain financing, the outcome of unperformed due diligence by the bidder, or any other contingencies (including any working capital adjustments); provided, however, that a bid may be subject to the confirmation of the accuracy and completeness of the specified representations and warranties in all material respects at the closing of the Asset Sale or the satisfaction of specified conditions in all material respects at the closing of the Asset Sale.  None of such conditions shall be materially more burdensome or unfavorable to the Debtors than those set forth in the Agreement.  Notwithstanding anything herein, the Competing Agreement must provide for the closing of the Asset Sale on a date no later than the date set forth in the Agreement subject to satisfaction of all conditions to closing.

(d)  The Competing Agreement does not entitle the bidder to any break-up fee, termination fee or similar type of payment or reimbursement.

(e)  A bid will not be considered by Debtors as qualified for the Auction if (1) such bid is not received by Debtors in writing on or prior to the Initial Bid Deadline, or (2) such bid or other information submitted by the bidder does not contain satisfactory evidence that the person submitting it has sufficient financial wherewithal to consummate the purchase contemplated thereby.

(f)  The Competing Agreement must identify (i) those executory contracts and unexpired leases of the Debtors which the bidder wishes to have assumed by the Debtors and assigned to it, and (ii) those liabilities which the bidder intends to assume.

(g)  The Competing Agreement must be accompanied by a letter affirmatively (i) setting forth the identity of the bidder, the contact information for such bidder, and full disclosure of any affiliates or insiders of the Debtors involved in such bid, (ii) stating that the bidder offers to purchase the Purchased Assets upon the terms and conditions set forth in the Competing Agreement, (iii) summarizing the proposed consideration the bidder proposes to pay under the Competing Agreement, (iv) stating the aggregate value of the consideration the bidder proposes to pay under the Competing Agreement (which statement of value shall not be binding on the Debtors or the Bankruptcy Court), and (v) stating the form of the Deposit (*i.e.*, cashier's check, cash or letter of credit) made by the bidder.

(h)  The foregoing materials must be received by Debtors' Counsel on or before the Initial Bid Deadline.

6.      Distribution of Qualified Bids Prior to Auction.  After the Debtors determine which bids are Qualified Bids, all Qualified Bids, along with the Debtors' determination as to the value of such bids and the discount, if any, that they are applying to such bids as a result of changes to this Agreement or otherwise, will be made available to each Qualified Bidder to allow each Qualified Bidder adequate notice and opportunity to (a) discuss any questions or comments about any Qualified Bids with the Debtors, and (b) prepare an Increased Bid prior to the Auction. If no Qualified Bids other than the Purchase Agreement are received by the Initial Bid Deadline, no Auction will be conducted, and the Stalking Horse Bidder will be deemed to be the Winning Bidder.  If the Stalking Horse Bidder is the Winning Bidder, the Debtors shall request at the Sale

Hearing that the Bankruptcy Court approve the sale of the Purchased Assets to the Stalking Horse Bidder.

7.      <u>Notification of Opening Bid</u>.    At the commencement of the Auction, the opening bid will be the Purchase Agreement.

8.      <u>The Auction</u>.

(a) If one or more Qualified Bids other than the Purchase Agreement are submitted in accordance with the Bidding Procedures, Debtor's Counsel will conduct an auction ("<u>Auction</u>") to be held on _____, 2010 commencing at ___:___ a.m., Eastern Standard Time. At the Auction, the Debtors shall have the right, in their sole discretion, to select the highest and best bid from the Stalking Horse Bidder or any other Qualified Bidder, subject to the resolution of any dispute by the Bankruptcy Court.  The Auction shall take place at the offices of Shutts & Bowen LLP, 1500 Miami Center, 201 South Biscayne Boulevard, Miami, Florida 33131.  Only Qualified Bidders may participate in the Auction and they must attend the Auction in person or through an authorized representative or agent with actual authority to participate in the Auction and bind such Qualified Bidder.  During the Auction, any Qualified Bidder may increase its Qualified Bid by another Qualified Bid that:

(i)      provides for cash consideration that exceeds by not less than $100,000 the cash consideration to be paid pursuant to the then highest Qualified Bid or Increased Bid (as defined below), if any;

(ii)     identifies specifically any other changes made to such Qualified Bidder's prior Qualified Bid; and

(iii)    satisfies the requirements of Sections 3(b) and 5 above.

Any bid received from a Qualified Bidder during the Auction that satisfies the requirements set forth in subsections (a)(i) through (a)(iii) above shall constitute an "<u>Increased Bid</u>."

(b)  Notwithstanding the foregoing, in the event of an Increased Bid, the Stalking Horse Bidder shall be entitled to submit successive overbids and shall be entitled, in the calculation of the amount of the Stalking Horse Bidder's overbids, to credit bid the Break Up Fee and any portion of the amount owed to the Stalking Horse Bidder or its affiliates pursuant to the Second Lien Notes.

(c)  The Debtors may adopt such additional and reasonable rules for bidding at the Auction that will better promote the goals of the bidding process, allow all Qualified Bidders reasonable notice and opportunity to submit Increased Bids, and are not otherwise inconsistent with any order of the Bankruptcy Court or these Bidding Procedures.

9.      <u>Selection of Winning Bidder</u>.    At the Auction, the Debtors shall review and consider each of the Qualified Bids and the Increased Bids, if any.  The Debtors shall be the sole arbiters of determining the highest and best offer, and they shall discount offers for additional risks associated with Competing Agreements such as delays in closing, contingencies, additional representations, etc.    The highest and best offer shall be determined and announced at the

conclusion of the Auction.  The bidder making the bid that is selected as the highest and best by the Debtors shall be considered the "<u>Winning Bidder</u>."  The Debtors shall announce and inform each of the Qualified Bidders of the decision regarding who is the Winning Bidder on the record of the Auction.

10.      <u>Bankruptcy Court Approval of the Winning Bidder</u>.  The Bankruptcy Court shall conduct an evidentiary hearing to confirm the results of the Auction, resolve any objections to the manner in which the Auction was conducted, approve the Winning Bidder and direct the Winning Bidder to close on the sale  ("Sale Hearing").

11.      <u>Additional Deposit if Stalking Horse Bidder is not the Winning Bidder</u>.  If the Stalking Horse Bidder is not the Winning Bidder at the Auction, the Winning Bidder shall deliver to Shutts & Bowen, as Escrow Agent, within two (2) Business Days of the Auction, a cashier's check payable to Shutts & Bowen LLP, as Escrow Agent or cash in an amount not less than $500,000 ("<u>Additional Deposit</u>").  Such Winning Bidder shall forfeit the Additional Deposit paid to Debtors if (i) the bidder withdraws or modifies its bid before the Bankruptcy Court approves the Debtors' selection of the Winning Bidder, and/or (ii) Winning Bidder (A) modifies or withdraws its bid without the Debtors' consent before the consummation of the sale contemplated by the Competing Agreement or (B) breaches the Competing Agreement.

12.      <u>Failure to Consummate Purchase</u>. The Debtors and the Winning Bidder shall be authorized to effect the sale of the Purchased Assets, or any part thereof, to the Winning Bidder following the entry of the Sale Order without further order of the Bankruptcy Court.  If any such failure to consummate the purchase is the result of a breach of the Purchase Agreement or the Competing Agreement by the Winning Bidder, the Deposit of such Winning Bidder shall be forfeited to the Debtors as liquidated damages in accordance with the Purchase Agreement or Competing Agreement.

13.      <u>Return of Deposits</u>.  Within two (2) Business Days after the entry by the Bankruptcy Court of its order ("<u>Sale Order</u>") approving the Sale of the Purchased Assets to the Winning Bidder, the Deposit submitted by all Qualified Bidders shall be returned, except for those submitted by (i) the Stalking Horse Bidder (if the Stalking Horse Bidder is not the Winning Bidder), in which case the Deposit shall be returned within two (2) Business Days after the Debtors' selection of the Winning Bidder (other than the Stalking Horse Bidder) at the conclusion of the Auction, (ii) the Winning Bidder, in which case the Deposit will be applied to the cash portion of the purchase price set forth in the Purchase Agreement or the Competing Agreement, as the case may be; <u>provided</u>, <u>however</u>, that if the Stalking Horse Bidder is not the Winning Bidder, the Deposit of the Winning Bidder will be applied first towards payment to the Stalking Horse Bidder of the Break Up Fee in accordance with the Purchase Agreement; and (iii) any bidders that forfeit their Deposit under Section 3(b)(v) above.  Except as otherwise provided for herein, in the event the Debtors cancel the proposed sale of the Purchased Assets or withdraw the Sale Motion, the Deposit submitted by all Qualified Bidders shall be immediately returned.

14.      <u>Business Judgment of the Debtors</u>.  The Debtors reserve the right (a) to send copies of these Bidding Procedures together with any other information to any potential interested party; (b) to determine whether the amendments and changes contained in each Competing Agreement are acceptable as terms and conditions to sell; (c) to determine which

Qualified Bid, if any, is the highest and/or otherwise best offer; and/or (d) to reject at any time prior to entry of an order of the Bankruptcy Court approving the sale to the Winning Bidder, any bid which the Debtors deem to be (i) inadequate or insufficient, or (ii) not in conformity with the requirements of the Bankruptcy Code or the Bidding Procedures.

25.    The Bidding Procedures provide a flexible process where the Debtors will be soliciting bids in a manner that will allow the Debtors to maximize the value of their assets given the severe liquidity constraints and accompanying time pressure they currently face.

### B.    Authority to Offer Breakup Fee.

26.    As set forth above in detail, the Debtors have determined, in the exercise of their best business judgment, that a sale of the Purchased Assets at this time to the Stalking Horse Bidder, subject to higher or better offers, is warranted and necessary. As set forth above, the Debtors request authority to enter into the Purchase Agreement with the Stalking Horse Bidder and approval of the Bidding Procedures, including (i) the amount and payment terms for the Break Up Fee, and (ii) certain other overbid protections set forth above.

27.    The ability of the Debtors to offer the Stalking Horse Bidder the proposed bidding protections is beneficial to the Debtors' estates and creditors because it affords the Debtors the means necessary to induce the Stalking Horse Bidder to submit or increase its bid prior to the Auction and allows the Debtors to establish a floor and appropriate parameters for the submission of Bids prior to the Auction.  Thus, even if the Stalking Horse Bidder is paid a Break Up Fee because the Stalking Horse Bidder is not the Winning Bidder, the Debtors and their estates will have benefited from the higher floor established by the Stalking Horse Bid and the certainty that such Bid brings to the sale process. Approval of breakup fees, expense reimbursements and other forms of bidding protection in connection with the sale of significant assets pursuant to section 363 of the Bankruptcy Code has become an established practice in chapter 11 cases.

28.     Three different approaches have been used by the bankruptcy courts in assessing the validity and enforceability of bidding incentives. The first approach – the business judgment test – is based on the corporate control cases and applies the business judgment rule to make certain that bidding is promoted, not deterred, and that the fees are reasonable in relationship to the size of the transaction and the bidder's efforts. *See In re Twenver, Inc.*, 149 B.R. 954, 956 (Bankr. D. Col. 1992), adopting *In re Integrated Resources, Inc.*, 135 B.R. 746, 753 (Bankr. S.D.N.Y. 1992), *aff'd*, 147 B.R. 650 (S.D.N.Y. 1992), *appeal dismissed*, 3 F.3d 49 (2d Cir. 1993); *In re Metaldyne Corp.*, 409 B.R. 661, 667-68 (Bankr. S.D.N.Y. 2009) (applying business judgment test to Debtor's selection of stalking horse bidder); *see also Cottle v. Stores Communications, Inc.*, 849 F. 2d 570 (11th Cir. 1988) (using business judgment test in corporate control context).  This approach also has been endorsed by a leading bankruptcy treatise. *See* 3 Collier on Bankruptcy § 363.02[6] at 363-21 (15th ed. 2005) (courts "should approve [bidding incentives] unless they are unreasonable or appear more likely to chill the bidding process than to enhance it.").

29.     The second approach – the best interests of the estate test – focuses on whether the bidding incentive at issue is in the best interests of the estate to ensure that the debtor's estate is not unduly burdened and that the relative rights of the parties are protected. *See In re America West Airlines, Inc.*, 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) ("this Court declines to follow other Bankruptcy Court's opinions where break-up fees are treated as another topic of corporate negotiation without reference to what in fact is in the best interests of the estate."); *see also In re S.N.A. Nut Co.*, 186 B.R. 98, 104 (Bankr. N.D. Ill. 1995) (adopting *America West*); *In re Tiara Motorcoach Corp.*, 212 B.R. 133, 137 (Bankr. N.D. Ind. 1997) (same).

18

30.    The third approach – the administrative claim test – considers whether the bidding incentive at issue is "actually necessary to preserve the value of the estate." *See In re O'Brien Environmental Energy, Inc.*, 181 F. 3d 527, 535 (3d Cir. 1999) (concluding that none of the cases which support the first two approaches "offers a compelling justification for treating an application for break-up fees and expenses under § 503(b) differently from other applications for administrative expenses under the same provision"); *see also AgriProcessors, Inc. v. Iowa Quality Beef Supply Network, L.L.C.* (*In re Tama Beef Packing, Inc.*), 290 B.R. 90, 97-98 (B.A.P. 8th Cir. 2003) (adopting reasoning of *O'Brien* and holding that administrative expense jurisprudence is applicable); *In re President Casinos, Inc.*, 314 B.R. 786, 789 (Bankr. E.D. Mo. 2004) (citing *Tama Beef* as applicable circuit precedent); *In re Dorado Marine, Inc.*, 332 B.R. 637 (M.D. Fla. 2005) (using administrative expense test, citing *O'Brien*); *In re Beth Israel Hospital Ass'n of Passaic*, 2007 WL 2049881 at *15 (Bankr. D.N.J. July 12, 2007) (break-up fees must be determined by the same standard applied to the allowance of any administrative expense); (*In re Reliant Energy Channelview, LP*, 403 B.R. 308, 311 (D. Del. 2009) (parties agreed that *O'Brien* set forth correct standard).

31.    The Debtors submit that under each of the above tests the proposed Break Up Fee will not chill bidding, but rather enhance it, and that the proposed Break Up Fee will preserve and enhance the value of the estates' assets.

32.    For simplicity's sake, the Stalking Horse Bidder has agreed to accept a single sum - $600,000– that will act as both the traditional break up fee and expense reimbursement.  This sum is intended to compensate the Stalking Horse Bidder for its time, efforts, investment and expenditures incurred in its due diligence investigation, evaluation of a bid for the Purchased Assets, negotiations and execution of the Purchase Agreement and ancillary documents, and

efforts related to consummation of the transaction contemplated thereby. The amount of the proposed Break-Up Fee is reasonable under the circumstances and in light of the substantial time and effort that the Stalking Horse Bidder has invested in negotiating the Purchase Agreement and related documents, as well as the risk taken by the Stalking Horse Bidder in connection therewith. Moreover, the Debtors submit that the amount of the Break-Up Fee, which, again, includes both the traditional break up fee and expense reimbursement, is consistent with both market rates and recent break up fees that have been approved in other large Chapter 11 cases. *See In re Continuum Care Services, Inc.*, No. 07-10749-JKO (Bankr. S.D. Fla. December 12, 2007) (approving breakup fee in the amount of $360,000 [3.0%]); *In re Gemini Cargo Logistics, Inc.*, No. 06-10870 (Bankr. S.D. Fla. April 17, 2006) (approving break-up fee payable in connection with exit financing and expense reimbursement of reasonable out-of-pocket expenses); *In re Piccadilly Cafeterias, Inc.*, No. 03-27976 (Bankr. S.D. Fla. September 14, 2004) (approving payment of expense reimbursement as bidder protection); *see also In re Tribune Company*, No. 08-13141(KJC) (Bankr. D. Del. August 31, 2009) (approving "Investor Protections" related to sale of Chicago Cubs that included a potential $20,000,000 maximum breakup fee [2.49%]); *In re Solutia Inc.*, Case No. 03-17949 (PCB) (Bankr. S.D.N.Y. October 19, 2005) (approving termination fee of $7.5 million [2.94%] and reimbursement of expenses up to $2 million); *In re Magellan Health Servs., Inc.*, Case No. 03-405115 (PCB) (Bankr. S.D.N.Y. September 8, 2003) (approving termination fee of $4 million [2.6%] and reimbursement of expenses up to $1 million); *In re Genuity Inc.*, Case No. 02-43558 (PCB) (Bankr. S.D.N.Y. December 16, 2002) (approving breakup fee of $10 million [4.1%] and expense reimbursement up to $3 million).

C.    **Proposed Notice of the Sale Hearing**

33.    Pursuant to Bankruptcy Rule 2002(a), the Debtors are required to provide their creditors with 20 days' notice of the Sale Hearing.  Pursuant to Bankruptcy Rule 2002(c), such notice must include the date, time and place of the Auction and the Sale Hearing, and the deadline for filing any objections to the relief requested.

34.    The Debtors have served, or will serve, this Motion on: (a) the Office of the United States Trustee; (b) the holders of the 20 largest unsecured claims against the Debtors; (c) counsel to any Committee that may be appointed; (d) all parties known to be asserting a lien in the Debtors' assets (including each of the Debtors' Senior Creditors); (e) all counterparties to executory contracts and unexpired leases potentially to be assumed and assigned; (f) all state attorney generals in states where the Debtors conduct business; and (g) various federal and state tax authorities, including the Internal Revenue Service (collectively, "Notice Parties").

35.    In compliance with Bankruptcy Rule 2002(c), the Debtors also will serve, by regular mail, a notice of the Bidding Procedures, Auction and Sale Hearing (the "Sale Notice"), substantially in the form annexed hereto as Exhibit B, which includes, among other things, the date, time and place of the Auction and of the Sale Hearing.  The Sale Notice shall be served upon (i) the Office of the United States Trustee for the Southern District of Florida; (ii) counsel to the Stalking Horse Bidder; (iii) the holders of the 20 largest unsecured claims against the Debtors; (iv) counsel to the Senior Creditors; (v) any party that, in the past year, expressed in writing to the Debtors an interest in acquiring the Purchased Assets, directly or through a merger or alliance; (vi) all parties who are known to assert claims upon the Purchased Assets; (vii) the U.S. Treasury; (viii) the Securities and Exchange Commission; (ix) the Internal Revenue Service; (x) all applicable state attorneys general, local environmental enforcement agencies and local regulatory authorities; (xi) all applicable state and local taxing authorities; (xii) the Federal

21

Trade Commission; (xiii) United States Attorney General/Antitrust Division of Department of Justice; (xiv) the U.S. Environmental Protection Agency; (xv) United States Attorney's Office; (xvi) the entities set forth in the Master Service List established in these cases; (xvii) all entities that have requested notice in these chapter 11 cases under Bankruptcy Rule 2002; and (xviii) any other party identified on the creditor matrices in these cases.

36.     The Debtors submit that the methods of notice described in this Motion comply fully with Bankruptcy Rule 2002 and constitute good and adequate notice of the Bidding Procedures and of the sale of the Purchased Assets. Therefore, the Debtors respectfully request that this Court approve the notice procedures proposed above.

     **D.**     **Sale of Substantially all Assets Pursuant to Section 363(b) of the Bankruptcy Code.**

37.     The Debtors request authority to sell, assign and transfer the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, pursuant to Section 363(b) of the Bankruptcy Code, which Section provides that a debtor in possession "after notice and a hearing, may use, sell or lease, other than in the ordinary course of business, property of the estate."

38.     The sale of the Purchased Assets to Stalking Horse Bidder pursuant to the Purchase Agreement constitutes substantially all of the Debtors' assets.  Courts interpreting Section 363(b) have approved non-ordinary course sales even where substantially all of a debtor's assets were being sold prior to proposal of a plan of reorganization.  *In re Lionel Corporation*, 722 F.2d 1063, 1070-71 (2nd Cir. 1983);; *In re Fontainebleau*, Case No. 09-21481-AJC (Bankr. S.D. Fla. June 9, 2009); *In re Solar Cosmetic Labs, Inc.*, Case No. 08-15793-LMI (Bankr. S.D. Fla. May 6, 2008); *In re Tower Automotive, Inc*., 342 B.R. 158, 163-64 (Bankr. S.D.N.Y. 2006 (discussing legal standards governing asset sales outside the plan process); *In re Parkstone Med. Info. Sys.*, 2001 WL 36189822 at *1 (Bankr. S.D. Fla. Oct. 16, 2001) (Hyman,

J.); *In re Baldwin United Corp.*, 43 B.R. 888, 905 (Bankr. S.D. Ohio 1984).  Following the guidelines established by the seminal decision of the Second Circuit in the *Lionel* case and its progeny, a debtor may sell all of the assets of the estate under Bankruptcy Code section 363 outside of a plan. As the *Lionel* court observed:

> Resolving the apparent conflict between Chapter 11 and § 363(b) does not require an all or nothing approach.  Every sale under 363(b) does not automatically short-circuit or side step Chapter 11; nor are these two statutory provisions to be read as mutually exclusive.  Instead, if a bankruptcy judge is to administer a business reorganization successfully under the Code, then ... some play for the operation of both 363(b) and Chapter 11 must be allowed for. ... The rule we adopt requires that a judge determining a section 363(b) application expressly find from the evidence presented before him at the hearing a good business reason to grant such an application.

*In re Lionel Corporation*, 722 F.2d at 1071; *see also In re General Motors Corp.*, 407 B.R. 463, 498 (Bankr. S.D.N.Y. 2009) (holding that proposed 363 transaction did not constitute an impermissible *sub rosa* plan); *In re Chrysler LLC*, 405 B.R. 84, 94 (Bankr. S.D.N.Y. 2009) (applying *Lionel* factors).

39.    Therefore, as a general rule, courts approve the sale of all or substantially all of a debtor's assets, prior to confirmation of a plan and pursuant to Section 363(b), provided the debtor establishes "sound business judgment" for such a transaction. *Parkstone Med. Info. Sys.*, 2001 WL 36189822; *In re Ionosphere Clubs, Inc.*, 184 B.R. 648, 653 (S.D.N.Y. 1995) ("courts consistently have acknowledged that assets of an estate can be sold prior to the confirmation, or even filing, of a plan").; *In re Lorraine Brooke Associates, Inc.*, 2007 WL 2257608 at *4 (Bankr. S.D. Fla. Aug. 2, 2007) (Cristol, J.) (applying business judgment test in assessing 363(b) motion in chapter 7 proceedings) (citing *In re Delaware & Hudson Railway Co.*, 124 B.R. 169, 175-176 (D. Del. 1991)); *In re Titusville Country Club*, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991).  The "sound business judgment" test requires a debtor to establish: (a) that a sound business reason justifies the sale outside the ordinary course of business, (b) that accurate and reasonable notice

has been provided to interested parties, (c) that the debtor has obtained a fair and reasonable price, and (d) good faith. *Id*.; *see also In re Equity Management Systems*, 149 B.R. 120, 124 (applying same factors); *In re Phoenix Steel Corporation*, 82 B.R. 334, 335 (Bankr. D. Del. 1987) (same*); In re Jon J. Peterson, Inc.*, 411 B.R. 131, 136 (Bankr. W.D.N.Y. 2009) (same) (citing *In re Lionel Corp.*, 722 F.2d at 1071 and *Phoenix Steel*, 82 B.R. at 335).

### 1.    Sound Business Reasons Exist to Sell the Assets at this Time.

40.    The Debtors respectfully submit that all of the factors demonstrating their sound business judgment are met, and that the sale should be approved. There are sound business reasons justifying the sale of the Purchased Assets to Stalking Horse Bidder, or the highest and best bidder, at this time. The Debtors have determined that the best way to maximize the value of their assets is to sell their business and property as a going concern, for fair market value, to the highest and best bidder, pursuant to a section 363 sale.

41.    Due to cash constraints, the Debtors must seek approval of the sale of the Purchased Assets to the Stalking Horse Bidder, or the highest and best bidder at the Auction, as quickly as possible. The Debtors in this case are the classic "melting ice cube." As it stands, the Debtors lack sufficient cash to make it to even an expedited sale and will need to obtain DIP financing to bridge that gap. Any delay in this case will only operate to increase debt and further erode the value of the Debtors' estates. If a sale is not consummated in the immediate future, the Debtors will be forced to liquidate and substantial going concern value will be lost.

42.    In addition, as set forth in the Meyer Declaration, the Debtors have only been able to secure the support of their critical vendors based upon their expectation of a "short bankruptcy" involving an expedited sale process. If the sale process does not move at a rapid pace, these critical vendors will abandon the Debtors and there will be no business left to salvage.

43. If the Debtors were required to effectuate these sales pursuant to the typical plan and disclosure statement process, the closings would not occur for several more months. Moreover, despite diligent efforts, the Debtors have been unable to identify any lenders who will provide a DIP Loan in the amount that would be necessary to carry the Debtors through the plan and disclosure statement process. Therefore, in order to avoid losing these valuable opportunities, and in order to preserve the maximum value of the Purchased Assets for the estates, the Debtors deem it necessary seek approval of the sales by way of motion rather than pursuant to a plan of reorganization.

44. Moreover, as set forth below, the Debtors may be required to close their operations and convert their cases to a Chapter 7 liquidation proceeding if this opportunity is lost. Attached hereto as Exhibit C is a liquidation analysis prepared by Mr. Woelcke demonstrating that, in the event that the Purchased Assets were liquidated in a Chapter 7 or a "forced sale" scenario, then, after accounting for the cost of liquidation, the Debtors project that they would receive between a low of $1,921,432.80 to a high of $3,045,793.70. Such liquidation value is substantially less than that which will be realized by the Debtors' estates under the Purchase Agreement. Moreover, a conversion to Chapter 7 would result in the loss of eighty-one jobs, as well as a future customer for all of the Debtors' vendors. As such, the Debtors submit that they have demonstrated sound business judgment for this Motion.

## 2. The Debtors have Obtained a Fair and Reasonable Price.

45. The Debtors believe that the sale proposed herein is the best way to preserve the going concern, enterprise value of the Purchased Assets and to maximize the value of the estates for the benefit of all creditors in these Chapter 11 cases. As set forth above, the Purchased Assets were extensively marketed by the Debtors prior to the filing of these Chapter 11 cases. After evaluating all of their options, the Debtors selected the Stalking Horse Bidder as the best offer

received for the Purchased Assets. Moreover, as set forth above, the substantial value to the Debtors' estates, as more fully set forth in the Purchase Agreement, greatly exceeds the liquidation value of the Purchased Assets. Finally, pursuant to Bidding Procedures set forth above, the sale will be subject to higher and better offers.

### 3. The Sale is in Good Faith.

46.     The Purchase Agreement is the product of good faith, arms' length negotiations between the Debtors and the Stalking Horse Bidder. The Stalking Horse Bidder is not an insider of the Debtors within the meaning of Section 101(31) of the Bankruptcy Code, and does not control or act on behalf of any insider of the Debtors. Therefore, the sale has been proposed in good faith. *See In re After Six, Inc.*, 154 B.R. 876, 883 (Bankr. E.D. Pa. 1993) ("deference to a DIP's decision as to a successful bidder of its assets is appropriate, and that decision may be honored unless it is proven that the DIP abused that discretion"); *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 149, n.5 (3d Cir. 1986) (purpose of good faith requirement is to "prevent[] a debtor-in-possession or trustee from effectively abrogating the creditor protections of Chapter 11."); *see also In re Lorraine Brooke Associates*, 2007 WL 2257608 at *4; *In re Grand Prix Associates, Inc.*, 2009 WL 1850966 at *4 (Bankr. D.N.J. June 26, 2009) ("A court may not find good faith if fraud, collusion, or unfair advantages are determined.") (citing *Abbotts Dairies*, 788 F.2d at 149-50).

### E. Sale of Assets Free and Clear of Certain Liens, Claims and Encumbrances.

47.     Pursuant to section 363(f) of the Bankruptcy Code, a debtor may sell property under Bankruptcy Code section 363(b) free and clear of liens, claims and encumbrances if one of the following conditions is satisfied: (a) applicable nonbankruptcy law permits the sale of the property free and clear of such interest; (b) the entity holding the lien, claim or encumbrance consents to the sale; (c) the interest is a lien and the price at which such property is to be sold is

greater than the aggregate value of all liens on the property; (d) the interest is in bona fide dispute; or (e) the entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of its interest. 11 U.S.C. § 363(f). *See In re Smart World Tech., LLC*, 423 F.3d 166, 169 n. 3 (2d Cir. 2005) ("Section 363 permits sales of assets free and clear of claims and interests. It thus allows purchasers ... to acquire assets [from a debtor] without any accompanying liabilities"); *In re Dundee Equity Corp.*, 1992 WL 53743, at *3 (Bankr. S.D.N.Y. Mar. 6, .1992) ("Section 363(f) is in the disjunctive, such that the sale free of the interest concerned may occur if any one of the conditions of § 363(f) have been met").

48.    The Purchase Agreement requires that the sale of the Purchased Assets be free and clear of all liens, claims, encumbrances and interests (collectively, "Liens").  Indeed, the Stalking Horse Bidder would not have entered into the Purchase Agreement if the sale of the Purchased Assets were not free and clear of all Liens.  The sale of the Purchased Assets pursuant to the Bidding Procedures will satisfy section 363(f) of the Bankruptcy Code because the Debtors believe that Wachovia will consent to such sale and/or the Debtors believe that they can compel such a sale over objection pursuant to one or more of the other subsections of section 363(f) of the Bankruptcy Code.  In all events, any Lien on the Purchased Assets sold pursuant to the Bidding Procedures shall attach to the net proceeds of the sale of the Purchased Assets.

49.    In addition, the Debtors submit that the Purchased Assets may be sold free and clear of all successor liability claims. Notwithstanding reference to the conveyance free and clear of "any interest" in section 363(f) of the Bankruptcy Code, that section has been interpreted to allow the sale of a debtor's assets free and clear of successor liability claims as well. *See, e.g., In re Trans World Airlines, Inc.*, 322 F.3d 283, 288-90 (3d Cir. 2003) (sale of assets pursuant to section 363(f) of the Bankruptcy Code barred successor liability claims for employment

discrimination and rights under travel voucher program); *In re Chrysler LLC,* 576 F.3d 108, 126 (2nd Cir. 2009) (agreeing with *TWA* decision "that the term 'any interest in property' encompasses those claims that 'arise from the property being sold.'"); *Am. Living Systems v. Bonapfel (In re All Am. of Ashburn, Inc.)*, 56 B.R. 186, 189-90 (Bankr. N.D. Ga. 1986), *affd*, 805 F.2d 1515 (11th Cir. 1986) (sale pursuant to section 363(1) barred successor liability for products defect claim).

### F.   The Winning Bidder Should be Afforded All Protections Under Section 363(m) as a Good Faith Purchaser

50.   Section 363(m) of the Bankruptcy Code protects a good faith purchaser's interest in property purchased from a debtor even if the sale conducted under section 363(b) is later reversed or modified on appeal. Specifically, section 363(m) states that: "The reversal or modification on appeal of an authorization under [section 363(b)] ... does not affect the validity of a sale ... to an entity that purchased ... such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale ... were stayed pending appeal 11 U.S.C. § 363(m)." *See Allstate Ins. Co. v. Hughes*, 174 B.R. 884, 888 (S.D.N.Y. 1994) ("Section 363(m) . . . provides that good faith transfers of property will not be affected by the reversal or modification on appeal of an unstayed order, whether or not the transferee knew of the pendency of the appeal"); *In re Global Vision Products, Inc*., 2009 WL 2170253 at *3 (Bankr. S.D.N.Y. Jul 14, 2009) (citing *Hughes*); *In re Stein & Day, Inc*., 113 B.R. 157, 162 (Bankr. S.D.N.Y. 1990) ("pursuant to 11 U.S.C. § 363(m), good faith purchasers are protected from the reversal of a sale on appeal unless there is a stay pending appeal"); *In re MacNeal*, 308 Fed. Appx. 311, 315 (11th Cir. 2009) ("after a sale is approved by the bankruptcy court and consummated by the parties, the sale may not be invalidated unless it is stayed pending appeal") (citing *In re The Charter Co*., 829 F.2d 1054, 1056 (11th Cir. 1987) ("In order to

protect those who purchase property from a bankruptcy estate, the Bankruptcy Code provides that once a sale is approved by the bankruptcy court and consummated by the parties, the bankruptcy court's authorization of the sale cannot be effectively altered on appeal.")).

51.     Although the Bankruptcy Code does not define "good faith," one court has held that the "[g]ood faith of a purchaser is shown by the integrity of his conduct during the course of the sale proceedings; where there is a lack of such integrity, a good faith finding may not be made.  A purchaser's good faith is lost by 'fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.'" *In re Gucci*, 126 F.3d 380, 390 (2nd Cir. 1997) (*quoting In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978)); *see also In re Andy Frain Services, Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986).

52.     Here, the selection of the Stalking Horse Bidder was the result of an extensive marketing process and extended arm's-length, good-faith negotiations.  The Debtors and the Stalking Horse Bidder were both advised by their legal and financial advisors throughout the process.  In the event of a competitive Auction, the Debtors will only select the Stalking Horse Bid as the Winning Bid if, after a review of all Qualified Bids (and Subsequent Bids submitted by the Stalking Horse Bidder or other Qualified Bidders), the Debtors determines that the Bid of the Stalking Horse Bidder is the highest and best offer submitted for the Purchased Assets. Accordingly, the Debtors request that the Court make a finding that the Stalking Horse Bidder, or the Winning Bidder at the Auction of the Purchased Assets, is entitled to the protections of section 363(m) of the Bankruptcy Code.

### G.    The Court Should Waive or Reduce the Periods Required By Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure.

53.    Pursuant to Rule 6004(h), all orders authorizing the sale of property pursuant to section 363 of the Bankruptcy Code are automatically stayed for 10 days after entry of the order, unless the court orders otherwise. Fed. R. Bankr. P. 6004(h).

54.    Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the 10-day stay period, *Collier* suggests that the 10-day stay period should be eliminated to allow a sale or other transaction to close immediately if there is a showing of a sufficient need to close the sale within the 10-day period. 10 Collier on Bankruptcy § 6004.10 (15th ed. 2007); *see In re Perry Hollow Management Co., Inc.*, 297 F.3d 34, 41 (1st Cir. 2002) (affirming bankruptcy court's decision to waive 10-day stay where trustee presented as evidence for the waiver that: (i) the sale price was reasonable; (ii) the buyer was ready to complete the sale the next day; and (iii) the debtor would incur costs for storing the sold property pending closing); *see also In re Second Grand Traverse School*, 100 Fed. Appx. 430 (6th Cir. 2004) (bankruptcy court's decision to waive automatic 10-day stay following sale of debtor's property was not abuse of discretion).

55.    In order to limit the costs of administering the Debtors' estates, it is critical that the Debtors close the sale of the Purchased Assets as soon as possible after the Sale Hearing. Accordingly, the Debtors hereby request that the Court waive the 10-day stay period under Bankruptcy Rules 6004(h) and 6006(d), to the extent applicable.

### H.    Assumption And Assignment of Executory Contracts and Unexpired Leases.

56.    The assumption and assignment of the Debtors' executory contracts and unexpired leases is an integral part of the proposed sale and should be approved by the Court. Section 365(a) of the Bankruptcy Code provides, in pertinent part, that a debtor in possession,

"subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. §365(a).  By enacting section 365(a) of the Bankruptcy Code, Congress intended to allow a debtor to assume those leases/contracts that benefit the estate, and to reject those that are of no value or are burdensome to the estate. *See Cinicloa v. Scharffenberger*, 248 F.3d 110, 119 (3d Cir. 2001); *In re Gardinier, Inc.*, 831 F.2d 974, 976 n.2 (11th Cir. 1987); *In re Whitcomb & Keller Mortgage Co., Inc.*, 715 F.2d 375, 379 (7th Cir. 1983); *In re Chira*, 367 B.R. 888, 898 (S.D. Fla. 2007); *In re Sandman Assocs., LLC*, 251 B.R. 473; 481 (W.D. Va. 2000) (noting that "[t]he authority granted by section 365 allows the trustee or debtor in possession to pick and choose among contracts, assuming those that are favorable and rejecting those that are not.").

57.    It is well established that decisions to assume or reject executory contracts or unexpired leases are matters within the "business judgment" of the debtor. *See In re Chira*, 367 B.R. at 897 ("[A] bankruptcy court reviewing a trustee's or debtor-in-possession's decision to assume or reject an executory contract [pursuant to § 365] should examine a contract and the surrounding circumstances and apply its best 'business judgment' to determine if it would be beneficial or burdensome to the estate to assume it.'" (quoting *In re Orion Pictures Corp.*, 4 F.3d 1095, 1099 (2nd Cir. 1993); *see also In re Prime Motor Inns*, 124 B.R. 378 (Bankr. S.D. Fla. 1991) (Cristol, J.) (applying the business judgment test in analyzing debtor's rejection of executory contract). Accordingly, courts routinely approve the assumption or rejection of an executory contract or unexpired lease unless evidence is presented that the debtor's decision to assume or reject was "the product of bad faith, whim or caprice." *In re Prime Motor Inns*, 124 B.R. at 381; *In re Surfside Resort and Suites, Inc.*, 325 B.R. 465, 469 (Bankr. M.D. Fla. 2005) (same) (citing *In re Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1047 (4th Cir. 1985).

58.    Adequate business justification exists to merit judicial approval of the proposed assumption and assignment of the Debtors' executory contracts and unexpired leases. The Debtors' contracts and leases are valuable assets of the Debtors' estates and represent an integral part of any proposed transaction for the sale of the Purchased Assets. To the extent that the Debtors can sell them as part of the sale, the sales will generate cash which the estates can use to satisfy claims and reduce potential claims against the estates.

59.    Section 365(b)(1) of the Bankruptcy Code authorizes a debtor-in-possession to assume and/or assign an executory contract if the debtor: "(A) cures, or provides adequate assurance that [it] will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an expired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph; (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and (C) provides adequate assurance of future performance under such contract or lease. . . ." Further, Section 365(f)(2) provides that: "The trustee may assign an executory contract or unexpired lease of the debtor only if - (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and (B) adequate assurance of future performance by the assignee of such contract or

lease is provided, whether or not there has been a default in such contract or lease.  *See* 11 U.S.C.

§§ 365(a), (b)(1), (f)(2). Accordingly, Section 365 of the Bankruptcy Code authorizes the

proposed assumptions and assignments of executory contracts and unexpired leases, provided

that the defaults under such contracts are cured and adequate assurance of future performance is

provided.

60.    It is well settled that the meaning of "adequate assurance of future performance"

depends on the facts and circumstances of each case, but that a contract counterparty is not

required to receive an absolute guarantee of future performance. *See, e.g., In re Glycogensys,*

*Inc.*, 352 B.R. 568, 578 (Bankr. D. Mass. 2006) ("[I]t is appropriate to evaluate the financial

condition of the assignee and the likelihood that the non-debtor party will receive the benefit of

its bargain from the assignee"); *In re Carlisle Homes, Inc.*, 103 B.R. 524, 538 (Bankr. D. N.J.

1989) (adequate assurance of future performance does not mean absolute assurance that debtor

will thrive and pay rent); *In re Prime Motor Inns, Inc.*, 166 B.R. 993, 997 (Bankr. S.D. Fla.

1994) (for purposes of 365(b)(1)(C), adequate assurance of future performance "is to be given a

practical, pragmatic construction based upon . . . the circumstances of [the] case." (quoting *In re*

*Carlisle Homes*, 103 B.R. at 538).

### 1.    Proposed Procedure for Assumption and Assignment of Executory Contracts and Unexpired Leases.

61.    In order to facilitate a process for the assumption and assignment of executory

contracts and unexpired leases that is integrated with the Bidding Procedures set forth above, the

Debtors propose and respectfully request approval of the following process for the Debtors to

assume and assign to the Stalking Horse Bidder or the Winning Bidder the Assumed Contracts.

62.    On or before five (5) business days prior to the Sale Hearing, the Debtors shall

file with the Bankruptcy Court and shall serve on each non-debtor counterparty to an Assumed

Contract (each such party a "Non-Debtor Counterparty" and each such agreement, a "Designated Agreement"), by overnight delivery service, a notice of assumption and assignment of executory contracts and unexpired leases ("Assignment Notice"). The Debtors shall attach to the Assignment Notice a list identifying the Non-Debtor Counterparties to each Designate Agreement and the cure costs, if any, that would be due pursuant to section 365(b)(1) of the Bankruptcy Code ("Cure Costs") to each Non-Debtor Counterparty, provided that such Assignment Notice shall in no way limit such Non-Debtor Counterparty's entitlement to Cure Costs by filing an objection to such Cure Costs prior to the Sale Hearing. The Assignment Notice shall also provide notice to each Non-Debtor Counterparty of the date and time of the Sale Hearing.

63.     Objections, if any to the proposed assumption and assignment of the Designated Agreements, including the Cure Costs, the provision of adequate assurance of future performance or objections relating to whether applicable law excuses the Non-Debtor Counterparty from accepting performance by, or rendering performance to, the Winning Bidder for purposes of Section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with the Court and served on the Notice Parties so as to be received no later than 12:00 pm Eastern one (1) business day prior to the Sale Hearing. Where a Non-Debtor Counterparty to an Designated Agreement files an objection to the assumption by the Debtors and assignment to the Winning Bidder of such Designated Agreement ("Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice ("Disputed Cure Costs"), the Debtors, the Winning Bidder and the Non-Debtor Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.

64.     If any of the Debtors, the Non-Debtor Counterparty or the Winning Bidder determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under Section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by the Bankruptcy Court at the Sale Hearing.

65.     Any Non-Debtor Counterparty to a Designated Agreement who fails to file a timely objection to the proposed Cure Costs or the proposed assumption and assignment of an Designated Agreement is deemed to have consented to such Cure Costs and the assumption and assignment of such Designated Agreement, and such party shall be forever barred from objecting to the Cure Costs or such assumption and assignment and from asserting any additional cure or other amounts against the Debtors, their estates or the Stalking Horse Bidder.

66.     If the Non-Debtor Counterparty to a Designated Agreement fails to timely assert an objection as described above, or upon the resolution of any timely objection by agreement of the parties or order of the Court approving an assumption and assignment, such Designated Agreement shall be deemed to be assumed by the Debtors and assigned to the Stalking Horse Bidder or other Winning Bidder and the proposed Cure Cost related to such Designated Agreement shall be established and approved in all respects, subject to the conditions set forth below.

67.     The Debtors' decision to assume and assign the Designated Agreements is subject to Court approval and consummation of the sale transaction with the Stalking Horse Bidder or a higher and better bidder pursuant to the Bidding Procedures. Accordingly, subject to the satisfaction of conditions to address any cure or assignment disputes, the Debtors shall be deemed to have assumed and assigned to the Winning Bidder each of the Designated

Agreements as of the date of and effective only upon the Closing Date, and absent such closing, each of the Designated Agreements shall neither be deemed assumed nor assigned and shall in all respects be subject to subsequent assumption or rejection by the Debtors under the Bankruptcy Code.  Assumption and assignment of the Designated Agreements also is subject to the Winning Bidder's rights set forth above.  The Winning Bidder shall have no rights in and to a particular Designated Agreement until such time as the particular Designated Agreement has been assumed and assigned in accordance with the procedures set forth herein.

68.     Based on the foregoing, the Debtors respectfully request that the Bankruptcy Court approve the procedure set forth above for the assumption and assignment of the Designated Agreements.

## NO PRIOR REQUEST

69.     No previous motion for the relief sought herein has been made to this or to any other court.

## CONCLUSION

WHEREFORE, for the reasons set forth herein, the Debtors respectfully request that the Court (a) approve the Purchase Agreement, (b) approve the Bidding Procedures set forth herein; (c) authorize the Debtors to provide certain stalking horse bid protections; (d) approve the Break Up Fee, as well as the payment terms related thereto as set forth in the Purchase Agreement; (e) schedule a final hearing to consider approval of, an approving, the sale of substantially all of the Debtors' assets; (f) authorize the Debtors to assume and assign certain executory contracts and unexpired leases in connection with the Purchase Agreement, (g) approve the form and manner of notice of the sale and of the Sale Hearing; and (h) grant such other and further relief as is just and proper.

**I HEREBY CERTIFY** that I am admitted to the Bar of the United States District Court for the Southern District of Florida and that I am in compliance with the additional qualifications to practice in this Court set forth in Local Rule 2090-1(A).

SHUTTS & BOWEN LLP
*Proposed Attorneys for Debtors-in-Possession*
1500 Miami Center
201 S. Biscayne Blvd.
Miami, Florida 33131
Telephone: (305) 358-6300
Facsimile : (305) 415-9873


By: */s/ Stephen P. Drobny*
Stephen P. Drobny
Florida Bar No. 55732
Peter H. Levitt
Florida Bar No. 650978